[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action seeking a dissolution of marriage on the ground of irretrievable breakdown which was filed by the plaintiff husband on December 9, 1998. In addition to the dissolution, the plaintiff is seeking joint custody of the minor children and a fair distribution of the marital property and debts.
The defendant wife filed an answer to the complaint as well as a cross complaint on April 10, 2001. In her answer, the defendant admitted to all of the material allegations of the complaint. Her cross complaint mirrors the allegations of the plaintiff's complaint and seeks a dissolution of the marriage, joint custody of the minor children, child support, alimony, exclusive use of the marital home, and an equitable distribution of the marital assets.
A trial was held on April 2, 3, and 4, 2002, at which both parties were present and were represented by attorneys. Numerous exhibits were admitted into evidence and testimony was given by the plaintiff, the defendant, three accountants, and two former employees of the parties. After thoroughly examining and considering the documentary evidence, and carefully reviewing and assessing the testimony and credibility of the witnesses, the court finds the following facts to have been proven.
Steven Weil and Alexandra Lowry were married on September 9, 1985 in South Windsor, Connecticut. They both lived in the State of Connecticut for more than 12 months immediately prior to bringing these actions. There are four minor children who are issue of this marriage: Matthew was born on September 18, 1987, Richard was born on December 25, 1990, Samuel was born on February 8, 1992, and William was born on August 4, 1997. Neither the parents nor the children have ever received state or local aid. The court finds that it has jurisdiction over the parties and the marriage.
The plaintiff is 47 years old and in good health. He earned a B.S. Degree in agricultural economics from the University of Connecticut in 1978, and he is six credits shy of earning an MBA in marketing and finance from the University of Connecticut.
The defendant is 41 years old and in good health. She has one and one-half years of college. While attending Fitchburg State College in Massachusetts as a nursing student, she was seriously injured in an automobile accident and had to withdraw from school. It took about six months for her to recuperate from her injuries and she never went back to CT Page 5361 school.
Prior to 1988 the plaintiff was employed as a salesman for several businesses. When the parties married in 1985 he was employed with the ADVO Company in Connecticut. That same year he was transferred to Virginia and was terminated in 1987, a year in which he earned $130,000 working for ADVO. The parties moved back to Connecticut in 1987 and the plaintiff obtained a sales position with an advertising firm in Wellesley, Massachusetts earning a base salary of $65,000 per year plus commissions. He remained in this job from December 1987 until July 1988 when he, and the defendant, began working for the Siftex Equipment Company (Siftex), a small company then owned by the husband's father.
By 1989 the plaintiff and the defendant were managing and operating the business and in November 1991 the father gifted the company to his two children. The plaintiff was given 51% of the company stock and his sister was given 49% of the stock. The plaintiff became the president and chief executive officer of the company and the defendant became the vice-president. The plaintiff's sister never worked for or in the company; however, as a 49% shareholder, she has annually shared in the profits of the company.
After leaving school and recuperating from her accident, the defendant worked in customer service and management positions for several years at the Williams Inn and the Berkshire Hilton Hotel in Massachusetts and the Park View Hilton Hotel in Hartford, Connecticut. She met the plaintiff while she was working at the Park View Hilton Hotel. She then obtained employment as an account examiner/office manager with the ADVO Company in Connecticut and was helpful in getting the plaintiff a sales position with ADVO as well.
ADVO did not have a position available for the defendant in Virginia when her husband was transferred to that state in 1985. Nevertheless, she quit her job in Connecticut and accompanied her husband to Virginia where she obtained employment with a direct mail consulting business. The parties purchased a house in Alexandria, Virginia but when the plaintiff lost his job with ADVO the plaintiff and the defendant, who was pregnant with their first child, decided that they wanted to be closer to their families so they sold the house, moved back to Connecticut, and rented a condominium in South Windsor.
Matthew was born in September 1987 and the parties thereafter bought a house in South Windsor where they remained for ten years. They hired a part time nanny to care for the child when he was about six months old so the defendant could join her husband working for Siftex. This arrangement was continued and expanded after the birth of other children. CT Page 5362
While the nanny took care of the children and did some of the household chores, the defendant worked for Siftex learning about the business, talking with customers, doing the bookkeeping, as well as packing and shipping products. This continued for several years during which the defendant gave birth to their second child, Richard, in December 1990 and their third child, Samuel, in February 1992. During this time, the defendant also worked part time for two years selling playbills for the Hartford Ballet in order to supplement the family finances.
Siftex did well under the plaintiff's ownership and direction. The plaintiff and the defendant were each paid a salary of $31,200 in 1991 and Siftex continued to grow each year thereafter. The plaintiff's 2001 salary from Siftex was $138,600.
The plaintiff first considered the possibility of divorcing the defendant in 1991 or 1992 because he believed that she was not fully committing herself to the business. He resented the fact that the defendant seemed to be more interested in staying at home as a homemaker/mother than working for the family business. He felt that this was a breach of a promise which she made to him that she would devote her full time to the business.
As a result of this tension, he engaged in therapy and they both attended marriage counseling. Thereafter, their relationship seemed to stabilize somewhat but the defendant continued to struggle with what she perceived as a conflict between the increasing needs of the children and the demands of the business. She continued to work for Siftex but more on a part time basis, as she began to devote more of her time to her responsibilities as a mother and homemaker. The year 1997 brought the birth of their fourth child, William, and a new house.
In December 1998 the plaintiff filed for divorce. The defendant sought a reconciliation but the plaintiff would not reconsider. The defendant's participation in the operation of Siftex was minimal after the plaintiff filed for divorce.
The court heard testimony from Jason Chatel, a former employee of Siftex. Chatel related that he observed the plaintiff and a female employee of Siftex engaging in sexual contact on several occasions prior to the filing of this action. The plaintiff denies that any such improper behavior occurred prior to his filing for a divorce but admits that he has had sexual relations with this same woman several times since the commencement of this action. The court found the testimony of Chatel to be reasonably credible. CT Page 5363
The plaintiff states that the reason for divorcing his wife was because his wife did not want to continue working full time for their business. He said that when they took over Siftex she promised to be a full time partner in the business, but after the birth of the children she wanted to be a full time mother and wife. He also claims that she spent too much money on their house and their children. He moved out of the marital home in February 1999.
The three oldest children are enrolled in school full time and each is engaged in after school activities and/or sports. The youngest child, age four, is still at home with his mother. He will be attending one-half day kindergarten beginning in September 2002.
The plaintiff has been paying the defendant pendente lite unallocated alimony/child support in the amount of $2730 bi-monthly. Additionally, the defendant babysits in her home during the school year earning approximately $100 per week. She also donates two to three hours per week volunteer work at her church where she teaches religious education, works in the soup kitchen, and spends time in a small group ministry program. Additionally, she spends some time doing volunteer work at the children's schools.
The parties own a residence at 50 Vincent Circle, South Windsor in which the defendant and the four children reside. They agree that the value of the house is $285,000 and that the property is encumbered by a mortgage loan of $243,770 as well as the balance of $14,000 from a non-secured personal loan of $20,000 used to purchase the marital residence The equity in the marital residence is slightly more than $27,000.
The plaintiff has IRA accounts with Fidelity ($11,112) and Quick 
Reilly ($27,262), and a deferred income retirement fund ($12,801). The defendant has IRA accounts with Fidelity ($10,809) and Quick Reilly ($12,460), as well as a deferred income retirement fund ($4,284).
Both parties currently have life insurance policies on their lives. The defendant has one policy for $250,000, and the plaintiff has three policies, two for $1,000,000 each and one for $160,000.
The most significant marital asset is the plaintiff's 51% interest in the Siftex Equipment Corporation. The defendant claims, but has not proven, that the plaintiff has a stock option to purchase his sister's 49% interest in the company. The only credible evidence produced concerning this so called stock option is a provision in the sister's will giving the plaintiff the right to purchase her shares of Siftex stock from her estate within six months following her death. There is no evidence that CT Page 5364 any consideration was given for this provision in the will and there is no claim that his sister is legally precluded from selling the stock or changing the will before her death. The court finds that the plaintiff does not have an enforceable option or agreement to purchase the stock prior to the death of his sister. The so-called stock option is a mere expectancy that may never be realized and therefore is not part of the marital estate. See: Dietter v. Dietter, 54 Conn. App. 481, 500 (1999).
By any reasonable criteria, the Siftex Equipment Corporation continues to be an expanding and growing business. Siftex defines its business as the manufacture and distribution of flexible rubber, plastic and fabric connecting sleeves, dust control items and parts used for industrial processing machines. There was persuasive testimonial and documentary evidence introduced during the trial that Siftex has established a foothold in its market and that it is in the process of attempting to expand its business into the New Zealand and Australian markets.
Siftex has consistently increased its net sales and gross profits every year since the plaintiff acquired 51% ownership and took over the operation of the business. In 1991 the net sales of the company were $255,714 with gross profits of $136,306. By 1997 the net sales had increased to $967,047 with gross profits of $468,529. Thereafter the net sales/gross profits increased to $1.09 million/$535,156 in 1998; $1.29 million/$617,878 in 1999; $1.3 million/$638,614 in 2000; and $1.34 million/$673,141 in 2001.
The court heard testimony from three accountants regarding the current value of Siftex. Collette Hefferon is a general accountant with a BA degree in accounting and business administration from Kings College. She has been self employed since 1990 and is currently doing business as Padgett Business Services. She offers accounting services for small businesses with twenty or fewer employees.
Hefferon has no experience or special expertise in performing valuations of businesses. She has been preparing monthly accounting statements and annual income tax returns for Siftex since about 1990. She testified for the plaintiff that in her opinion the equity position of the company as of December 31, 2001 was $107,000. This opinion was based solely upon her analysis of the assets and liabilities of Siftex as of that date. She did not conduct a thorough evaluation of the company.
Steven Dane is a certified public accountant and is accredited in business valuation by the American Institute of Certified Public Accountants. He received a BS degree in economics from The Wharton School, University of Pennsylvania, and an MBA from the University of Chicago. He has more than twenty years of experience in accounting and is CT Page 5365 currently a partner with the accounting firm of Themistos Dane, P.C. of Springfield, Massachusetts. He was hired by the defendant to conduct a valuation of Siftex. Dane has previously testified as an expert witness before state and federal courts.
Among other factors utilized in preparing his analysis of the value of Siftex, Dane considered the nature and history of the company, the general and industry specific national and regional economic outlook, the financial condition and earnings capacity of the company, the good will and other intangible value of the company, and the value of other companies engaged in the same or similar business activities. Based upon his analysis, assumptions and methodology, Dane's opinion as to the fair market value of the plaintiff's 51% interest in Siftex as of December 31, 2001 was $338,000
Joseph Handleman is a certified public accountant who received his BS degree in accounting from the University of Connecticut. He has more than thirty years of experience in accounting and is currently employed with the accounting firm of Pue, Leibowitz Chick, LLC in Vernon, Connecticut. He was hired by the plaintiff basically to critique the Siftex evaluation done by Steven Dane
Handleman acknowledged that business valuations are not a significant part of his business or experience. Over the past thirty years his experience in this area consisted of giving verbal advice and opinions to between ten and twenty of his clients who were interested in buying or selling a business. He has taken four continuing education courses which generally related to business valuations over the past thirty years. He has never conducted a formal evaluation of a business and has never before testified in court about the value of a business.
Handleman prepared and submitted a critique of the Dane evaluation report after reviewing drafts of Dane's December 31, 2001 valuation report and after discussing that data and the operation of Siftex with the plaintiff. In his written report and testimony, Handleman was critical of some of the accounting assumptions and methodology utilized by Dane in arriving at his evaluation of the business. By utilizing different assumptions and methodology, and applying the same to the data used by Dane, Handleman concluded that the fair market value of the plaintiff's 51% interest in Siftex as of December 31, 2001, was $171,600.[1]
The court does not question the competency of Ms. Hefferon and Mr. Handleman in their areas of expertise, but their scarcity of knowledge and experience specifically relating to the evaluation of businesses was obvious and revealing. As a result, the court did not find their opinions CT Page 5366 as to the value of Siftex to be persuasive.
After considering all of the evidence, assessing the professional qualifications and experience of the expert witnesses in conducting business evaluations, and weighing the credibility of the witnesses, the court finds that the evaluation of the Siftex Equipment Corporation conducted by Steven Dane most accurately reflects the value of the plaintiff's 51% interest in Siftex. Accordingly, the court finds that interest to be $338,000 as of December 31, 2001.
The court finds that the primary cause for the breakdown of this marriage was the plaintiff's unwillingness to accept his wife's wish to reduce her role in the operation of the family business, and her desire to be a full time mother to their four children. The court found the defendant's testimony regarding why she thought the marriage failed to be compelling when she said that she really wasn't sure why the marriage had broken down. She said that she tried, but she just couldn't be what he wanted her to be.
After taking into consideration all of the statutory criteria, including but not limited to the factors set forth in § 46b-62, § 46b-81, and § 46b-82, and applying the same to the evidence, the court enters the following orders.
A decree is entered dissolving the marriage of the parties on the grounds of an irretrievable breakdown, all the allegations of the complaint and the cross-complaint having been proven.
1. The parents shall have joint legal custody of the minor children. The primary residence of the children will be with the mother who shall be the custodial parent. Detailed parenting plans submitted by the parties have been slightly modified by the court in the best interest of the children. Said parenting plan is attached hereto as Appendix A and is included in the orders of the court.
2. The defendant devoted many years and considerable time and effort working in and for the family owned business, raising and caring for their four children, and maintaining the family during sixteen years of marriage. With the exception to the past three years, while this case was pending, the defendant did her best to make Siftex and the marriage a success. Her contribution to the financial success of her husband's business and to the well being of the children and the welfare of the family during the marriage are as significant and important to the accumulation of marital assets and the welfare of the family as are the contributions of the plaintiff. CT Page 5367
The defendant is 41 years old. She does not have a college education and her recent work experience is limited. She will need substantial training and additional education if she is to develop sufficient marketable skills to permit her to eventually enter a competitive workforce and earn a salary sufficient to make her financially independent. She will have to do this while continuing to raise and provide a stable home for the four children through their adolescent years. All of this will take time and effort, and will require considerable financial support, which the plaintiff is capable of providing.
Accordingly, beginning May 1, 2002, the husband is ordered to pay to the plaintiff unallocated child support and alimony in the amount of $75,000 per year for a period of four years, followed by unallocated child support and alimony of $60,000 per year for a period of four years. Said child support/alimony is to be paid to the wife through bi-monthly direct deposits into her specified bank account. The total effective term of eight years shall be non-modifiable, except that it shall earlier terminate upon the death of either party or the marriage of the defendant.
Unless there is a change in the regulations of the Federal Government which would preclude the plaintiff from fully deducting the unallocated child support/alimony payments from his income taxes, this unallocated child support/alimony award shall be non-modifiable during the first four years. Thereafter, said award may be modified upon proof of a substantial change of circumstances. Inasmuch as the child support/alimony award is unallocated, and has a built in reduction during the eight year period, the fact that a child has reached the age of majority shall not be considered a substantial change of circumstances.
When the plaintiff is no longer obligated to pay unallocated support/alimony under the terms of this judgement, he shall nevertheless continue to be obligated to pay child support in compliance with the child support guidelines until each child reaches the age of nineteen years or graduates from high school, whichever occurs sooner. No alimony is awarded to the plaintiff
3. The wife shall be entitled to claim all four of the children as exemptions for state and federal income tax purposes so long as the husband is paying unallocated alimony and support and is able to deduct said payments from his Federal income taxes. Once unallocated alimony and support ceases, the parties shall equally split the dependency exemptions for both Federal and State tax purposes. The parties shall exchange federal income tax returns beginning on May 1, 2003, and each May 1st
thereafter, for so long as the plaintiff has a legal obligation to pay CT Page 5368 child support.
4. The plaintiff shall continue to provide health and dental insurance for the children as available through his employer for so long as he is obligated to pay child support for said children. Unreimbursed medical, dental, and other health related expenses for the minor children shall be shared according to the child support guidelines: 66% by the plaintiff and 33% by the defendant, after the first $100 deductible which is to be paid by the defendant. The plaintiff shall also be responsible for 66% of any childcare expenses for the minor children, pursuant to the child support guidelines. The provisions of Connecticut General Statutes §46b-84 shall apply.
5. As part of the equitable distribution of the marital property relating to this dissolution, the husband shall Quit Claim to the wife his interest in the marital residence at 50 Vincent Circle, South Windsor, Connecticut within 30 days of the date of judgement of dissolution . . . The wife shall thereafter be solely responsible for all obligations relating to the property, including but not limited to the mortgage, maintenance, utilities, taxes, and the $14,000 personal loan, and she shall hold the plaintiff harmless from the same. If it is financially feasible, the defendant shall refinance the mortgage and remove the husband's name from the mortgage within two years of this judgement.
6. The plaintiff has been the owner, CEO, and President of Siftex for slightly more than ten years, and the business has consistently demonstrated growth for each of those ten years. The defendant, who was the Vice President of Siftex, also worked for and contributed to the growth of Siftex, both directly and indirectly, for seven of those ten years. She effectively ended her active involvement with Siftex after the plaintiff filed for divorce in December 1998.
Taking these facts into consideration in shaping an equitable distribution of the marital assets, the court awards the defendant wife a partial property settlement of $120,000 which represents approximately 35% of her husband's 51% interest in the Siftex Equipment Company. The current fair market value of the husband's interest in Siftex is $338,000. The plaintiff shall retain all of his right, title and interest in Siftex Equipment Company, and the defendant shall make no additional claim on the plaintiff's interest in Siftex.
The plaintiff shall pay this $120,000 property settlement to the defendant at the rate of $10,000 per year for a period of twelve years. Said payments shall be made semi-annually with a $5,000 payment due and payable on the first of June and the first of December each year beginning CT Page 5369 on June 1, 2003. The plaintiff shall have the option of making a single lump sum payment to the defendant of the balance of the $120,000 owed at any time.
The payment of this property settlement to the defendant shall not constitute a substantial change in circumstances for the purpose of modifying child support or alimony.
7. The plaintiff shall obtain and continuously maintain, at his cost, an insurance policy on his life in the face amount of at least $500,000 naming the defendant and their four children as sole irrevocable beneficiaries for so long as he has a property settlement, support or alimony obligation. The plaintiff shall provide annual proof of the continued viability of said life insurance policy upon written request of the defendant.
8. With the exception of the Capital One Account, which the defendant lists on Schedule A of her April 2, 2002 financial affidavit with a balance of $8,899, each party shall be solely responsible for the debts listed on his or her financial affidavit and shall hold the other harmless thereon. The parties shall be equally responsible for payment the $8,899 balance in the Capital One Account.
9. Each party shall have sole ownership interest in any motor vehicles currently in their possession and shall be responsible for all taxes, insurance and loans relating to said motor vehicles and hold the other party harmless thereon. The parties shall cooperate in transferring their interest in said motor vehicles, if any, to the other party.
10. The parties shall retain sole interest and ownership of their individual IRA and retirement accounts as reflected on their financial affidavits.
11. The parties shall be responsible for paying for their own health insurance coverage. The plaintiff shall arrange for defendant to obtain her health insurance under his group plan with Siftex Equipment Company through COBRA.
12. Given the nature and structure of the court orders regarding the distribution of the marital assets, the court finds that neither party has a significant advantage over the other with respect to available cash assets to pay attorney and accountant fees. The distribution of marital assets in this case is designed to give both parties the ability to pay their own costs and fees. Therefore, each party shall be solely responsible for payment of their own attorney and accounting fees. CT Page 5370
Counsel for the plaintiff shall prepare and submit to the court a judgement file within 30 days of the date of this judgement. Both the plaintiff's attorney and the defendant's attorney shall sign the judgement file.
Terence A. Sullivan Superior Court Judge
 APPENDIX A
PARENTING PLAN
1. Custody
1.1. The Father and Mother shall have joint legal custody of the minor children. The primary residency of the children shall be with their mother, and father shall have reasonable parental access rights as hereafter provided.
1.2 Definition of Joint Custody.
It is the intention of the parents, in agreeing to joint custody, that each of them shall continue having an equal role in providing a sound moral, social, economic and educational environment for the children. In accepting this joint legal custodial arrangement, the parties shall exert their best efforts to work cooperatively in developing future plans consistent with the best interests of the children and in amicably resolving such disputes as may arise.
1.3. Major Decisions.
Major decisions, which shall be defined as those key issues affecting the childrens' health, growth and development, course of study, extent of travel away from home, choice of camp, major medical treatment, lessons, psychotherapy, psychoanalysis or like treatment, part or full time employment, purchase or operation of a motor vehicle, specially hazardous sports or activities, contraception and sex education, or religious upbringing, non-emergency health care, significant changes in social environment and decisions relating to actual or potential litigation involving the children directly or as beneficiary, other than custody, shall be considered and discussed in depth by and agreed to by both parties. CT Page 5371
In accepting the broad grant of privileges conferred by this joint custodial arrangement, the parties specifically recognize that these powers shall not be exercised for the purpose of frustrating, denying or controlling in any manner the lifestyle of the other parent. The parties shall exert their best efforts to work cooperatively in developing future plans consistent with the best interest of the children and in amicably resolving such disputes as may arise.
Neither party shall do anything which may estrange the children from the other nor injure the opinion of the children as to their mother or father, nor act in such a way as to hamper the free and natural development of the childrens' love and respect for the other party.
1.4. Routine Decisions.
Day-to-day decisions of a routine nature, including but not limited to bedtime, homework, health care, and day-to-day school and social activities customary for a child of his age and maturity, shall be made by the parent with whom the children are actually staying. The parents shall endeavor to cooperate and establish a mutually agreeable policy regarding such day-to-day decisions, but the primary responsibility for routine decisions shall rest with the parent with whom the children are then staying.
1.5. Parenting Schedule.
1.5.1. Each party shall have full, liberal, and flexible rights of reasonable access to and parenting responsibility for the children, which shall include, but not be limited to free access to and communication with the children and reasonable opportunities to spend time with the children and to have the children spend time with him or her, including overnights and reasonable periods during the school vacations.
1.5.2. Unless the parties agree otherwise, father shall care for the children every Thursday overnight and return Friday by 8:00 a.m. and every other weekend from Friday 5:00 p.m. to Monday morning. In addition, when school is not in session, father shall have one child for an overnight each week from 5:00 p.m. Tuesday until 8:00 a.m. Wednesday to allow individual parenting time.
1.5.3. The father and mother shall each have the option of having the children for one of the school vacation weeks, President's Birthday week or Spring vacation week. The parties will decide which week they prefer on a yearly basis. The mother shall have first choice in even numbered years and the father shall have first choice in odd numbered years. By CT Page 5372 agreement, the parents may also split the vacation weeks.
1.5.4. Easter Sunday will be alternated.
1.5.5. The father shall have the children on Father's Day and his birthday.
1.5.6. The mother shall have the children on Mother's Day and her birthday.
1.5.7. Memorial Day weekend from after school Friday until 6:00 p.m. Monday will be alternated, with mother having the 2002 holiday weekend.
1.5.8. The childrens' birthdays are to be celebrated whenever the children are with the respective parent.
1.5.9. Independence Day will be alternated, with father having the 2002 holiday.
1.5.10. Each party may have two non-consecutive weeks of summer vacation with the children from 10:00 a.m. on Monday to 10:00 a.m. on the following Monday. Each parent shall give the other written notice no later than May 1St of each year as to which weeks they intend to take for summer vacation.
1.5.11. Labor Day weekend from after school Friday until 6:00 p.m. Monday will be alternated, with father having the 2002 holiday.
1.5.12. Columbus Day weekend from after school Friday until 6:00 p.m. Monday will be alternated, with mother having the 2002 holiday.
1.5.13. The Thanksgiving weekend will be alternated and divided. In odd numbered years the father shall have the children on Thanksgiving day and until Friday at 10:00 a.m., when he shall transport the children to mother's home, and mother shall have the children for the balance of the weekend. The process shall reverse itself in even numbered years.
1.5.14. The children will be with their mother every Christmas Eve until noon on Christmas Day. The children will then be with their father from noon Christmas Day until 6:00 p.m of the following day.
1.5.15. Christmas school vacation will be divided between the parents, with each having an equal share of the days.
1.5.16. All holiday and vacation time shall preempt the regular parenting schedule, so that if one parent's holiday falls on the other CT Page 5373 parent's weekend, the parent having the holiday that year will have the children for that weekend. This does not apply to childrens' birthdays.
1.5.17. Notwithstanding the above referenced schedule, the parties agree that all referenced weekends may be split or the schedule otherwise altered by mutual agreement to meet the best interests of all parties.
1.5.18 The parties shall use their best efforts to adjust the visitation schedule upon reasonable request and notice from the other party, keeping in mind the best interests of the children. In the event that a dispute arises as to the visitation schedule or other decision-making areas, the parties shall attempt to resolve such disagreement by mutual agreement.
1.6. Information as to the Children.
1.6.1. Each of the parties agrees to keep the other informed of the whereabouts of the children whenever they are out of state overnight. The parents will use reasonable efforts to keep each other informed about the childrens' social plans and activities so that the children can be reached by either parent in the event of an emergency.
1.6.2. In the event of the illness or personal injury of the children, the first party to learn of such illness or injury shall notify the other immediately, and each party shall keep the other reasonably informed of the whereabouts and condition of the children. For the purpose of this paragraph, the world "illness" shall mean any sickness or ailment which requires the services of a physician. The word "injury" shall mean any injury, which requires the services of a physician. During any illness or injury, the parties shall have the right of reasonable visitation to the children in addition to their other rights provided herein. When the children are ill with the father, he assumes responsibility to take the children to the doctor and the same applies to the mother. In the event the other parent is unavailable to be informed, the supervising parent has full authorization to make medical decisions regarding the treatment of the children without the need for a signed release from the other parent. The parties agree that if either of them has knowledge of any illness or accident or other circumstances seriously affecting the health or welfare of the children then father or mother, as the case may be, will promptly notify the other, and both parties shall have unlimited visitation privileges, consistent with the circumstances, for so long as the situation pertains.
1.6.3. Each of the parties shall furnish the other copies of any reports from third parties concerning the health, education, or welfare of the children, including report cards or other correspondence from the CT Page 5374 childrens' school, with school instructions to send all such information to both parents, and complete information from any physician, dentist, psychologist, consultant, or any specialist attending to the children for any reason whatsoever, within a reasonable time after receipt thereof, and each shall have the right to require such reports from third persons.
1.6.4. Each parent shall be entitled to complete detailed information from any teacher, school or college and shall be entitled to be furnished with copies of all reports or records with respect to the childrens' education.
1.6.5. Both parties shall provide the other with any address and telephone number change forthwith.
1.7. Removal from State.
1.7.1. Neither party shall, without 90 days prior written notice to the other party, remove the minor children from the State of Connecticut with the intention of permanently changing their residence. Said notice shall include the address of the new location, date of intended removal and reason for removal.